# UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

|  |  |  |
|---|---|---|
| *In re*: | ) | Case No. 09-73717-FJS |
|  | ) |  |
| Charles D. Hadley, III, | ) |  |
| Janet M. Hadley, | ) |  |
|  | ) |  |
| *Debtors.* | ) | Chapter 13 |
|  | ) |  |
| Direct Capital Group, LLC, | ) |  |
|  | ) |  |
| *Plaintiff,* | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| Charles D. Hadley, III, | ) |  |
|  | ) |  |
| *Defendant.* | ) | APN: 09-07141-FJS |

## MEMORANDUM OPINION

This matter comes before the Court upon trial of the above-captioned adversary

proceeding. The Court has subject-matter jurisdiction over this proceeding pursuant to 28 U.S.C.

§§ 1334(b) and 157(a) and the General Order of Reference from the United States District Court

for the Eastern District of Virginia dated August 15, 1984. This matter is a core proceeding

pursuant to 28 U.S.C. § 157(b)(2)(I). Venue is proper pursuant to 28 U.S.C. §§ 1408(1) and

1409(a). Upon consideration of the pleadings, the evidence presented at trial, and the arguments

of the parties, the Court makes the following findings of fact and conclusions of law pursuant to

Federal Rule of Bankruptcy Procedure 7052. As stated below, the Court dismiss Plaintiff's §

523(a)(4) count and denies without prejudice Plaintiff's § 523(a)(6) count; the Court previously

1

dismissed Plaintiff's § 523(a)(2) count.

## I. BACKGROUND

### A. The Debtors' Chapter 13 Case

On September 8, 2009, Charles D. Hadley, III (the "Defendant") and Janet M. Hadley (collectively, the "Debtors") filed, as joint debtors, a voluntary petition for relief pursuant to Chapter 13 of Title 11 of the United States Code (the "Code"). (Case No. 09-73717-FJS, Doc. No. 1.) On September 14, 2009, the Debtors filed their first Chapter 13 Plan. (Case No. 09-73717-FJS, Doc. No. 12.) The Debtors filed an Amended Plan on January 29, 2010. (Case No. 09-73717-FJS, Doc. No. 33.) Ultimately, the Debtors filed a Second Amended Plan on April 19, 2010 and a Third Amended Plan on July 8, 2010. (Case No. 09-73717-FJS, Doc. Nos. 62, 81.) On August 3, 2010, the Chapter 13 Standing Trustee filed an Objection to Confirmation of the Debtors' Third Amended Plan, citing failure to make a lump sum payment required under the terms of the Plan.[1] (Case No. 09-73717-FJS, Doc. No. 90.) Subsequently, on November 16, 2010, the Chapter 13 Standing Trustee filed a Motion to Dismiss the Case for failure to make plan payments because the Debtors were five months in arrears on their Chapter 13 Plan (the "Motion to Dismiss"). (Case No. 09-73717-FJS, Doc. No. 96.) On January 6, 2011, the Court entered an Order settling the Motion to Dismiss. (Case No. 09-73717-FJS, Doc. No. 98.) The Debtors' Chapter 13 plan has yet to be confirmed by Order of the Court.[2]

---

[1] The Chapter 13 Standing Trustee's Objection to Confirmation also states that the "Trustee has a pending Motion to Dismiss based on eligibility . . . [that] has been continued generally until the debtors' Objection to Padgett's Claim and Complaint to Determine Dischargeability and to Deny Discharge have been resolved." (Case No. 09-73717-FJS, Doc. No. 90.)

[2] On April 11, 2011, Counsel for the Debtors filed an Application for Compensation. (Case No. 09-73717-FJS, Doc. No. 100.) On May 24, 2011, the Court held a hearing on the Application for Compensation and continued the matter until resolution of the adversary proceedings filed against Defendant. (Case No. 09-73717-FJS, Doc. No. 106.)

## B. Factual History

The instant matter is one of three pending adversary proceedings filed against Defendant. On December 14, 2009, Reginald J. Padgett ("Padgett") filed suit against Defendant seeking a determination of nondischargeability as to certain debts pursuant to §§ 523(a)(2)(A) and 523(a)(4) of the Code. (APN 09-07140, Doc. No. 1.)[3] On December 14, 2009, Direct Capital Group, LLC ("Plaintiff" or "DCG"), in the instant matter, filed suit against the Debtors seeking a determination of nondischargeability as to certain debts pursuant to §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6) of the Code. (APN 09-07141, Doc. No. 1.) Plaintiff also sought a denial of the Debtors' discharge pursuant to § 727 of the Code. Lastly, on April 19, 2010, Textron Financial Corporation ("TFC") filed suit against Defendant seeking a determination of nondischargeability as to certain debts pursuant to §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6) of the Code. (APN 10-07053-FJS, Doc. No. 1.) The Court will issue separate Orders and Memorandum Opinions in each adversary proceeding.

The facts of each of adversary proceeding arise out of the same circumstances. Atlantic Golf Cart and Equipment, Inc. ("Atlantic Golf") is a corporation registered with the State Corporation Commission for the Commonwealth of Virginia, and its principal business purposes were (1) to sell new and used golf carts, (2) repair and service golf carts, and (3) lease out golf carts. (Pl.'s Ex. 11, June 7, 2010 Dep. Tr. of Def. at 11:2-12:17.) DCG's and TFC's allegations center around the fact that golf carts leased or sold to Atlantic Golf disappeared from Atlantic Golf's inventory without the lessor or retailer having been properly compensated, in contravention of existing contracts.

---

[3] All parenthetical references to documents filed in the instant matter—APN 09-07141—shall be cited as (APN Doc. No. __.), and any reference to documents filed in other adversary proceedings will included the relevant APN number, such as (APN 09-07040 Doc. No. __.).

Defendant has been employed on a full time basis as a firefighter for the City of

Chesapeake since 1984.  (Pl.'s Ex. 11 at 7:17-20.)  Defendant has been an officer and

stockholder in Atlantic Golf since its inception in 1990.  (Pl.'s Ex. 11 at 10:5-6.)  Defendant

served as vice-president of Atlantic Golf between 1991 and 1998.  Defendant became president

of Atlantic Golf in 1998.  (Pl.'s Ex. 11 at 9:17-18, 9:24-10:2.)  Until October 31, 2001,

Defendant held 50% of Atlantic Golf's stock.  (Pl.'s Ex. 11 at 9:10-10:23.)  Padgett held 50% of

Atlantic Golf's stock up until October 31, 2001, when Padgett sold his 50% interest in Atlantic

Golf to Defendant.  (APN 09-07140-FJS, Doc. No. 1, ¶ 7.)

## 1. The Master Lease Agreement & Guaranty

DCG, based in Portsmouth, New Hampshire, provided equipment financing to Atlantic

Golf during the relevant period.  DCG purchased golf carts from third party manufacturers and

leased those carts to Atlantic Golf.  (Pl.'s Ex. 2 at 1; Pl.'s Ex. 3 at 2.)  On March 20, 2007,

Atlantic Golf and DCG entered into the Master Lease Agreement (the "Master Lease

Agreement").  (Pl.'s Ex. 1.)  By its terms, the Master Lease Agreement incorporated Equipment

Schedule No. 8241 (the "First Equipment Schedule") that was executed by DCG and Atlantic

Golf on March 20, 2007.  (Pl.'s Ex. 3.)  According to the First Equipment Schedule, Atlantic

Golf leased from DCG sixteen golf carts.  (Pl.'s Ex. 3, at 3.)  Atlantic Golf agreed to pay to DCG

48 monthly payments of $1,518.63, plus fees and taxes.  On behalf of Atlantic Golf, Defendant

signed the Master Lease Agreement in his official capacity as president of Atlantic Golf.  (Pl.'s

Ex. 1, at 3.)

The Master Lease Agreement also included a Master Guaranty (the "Master Guaranty")

that incorporates the terms of the Master Lease Agreement that Defendant signed as Guarantor in

his personal capacity.  (Pl.'s Ex. 1, at 3.)  A Master Delivery Guaranty and Master Assignment of

4

Invoices (the "Master Delivery Guaranty") was executed and is an addendum to the Master

Lease Agreement. (Pl.'s Ex. 1, at 4.) Defendant signed the Master Delivery Guaranty on behalf

of Atlantic Golf. By its terms, the Master Delivery Guaranty authorized DCG to pay in advance

equipment suppliers the balance of invoices due before delivering the equipment to Atlantic

Golf. From the limited evidence in the record, DCG purchased golf carts from TFC and would

later lease those golf carts to Atlantic Golf. The First Equipment Schedule indicates that TFC

billed directly DCG for golf carts that Atlantic Golf ordered from TFC. (Pl.'s Ex. 3, at 3.) DCG

then leased those golf carts to Atlantic Golf, per the Master Lease Agreement. Further, where

DCG paid in advance, Atlantic Golf agreed to pay DCG for funds advanced to equipment

suppliers. (Pl.'s Ex. 1, at 4.)

Atlantic Golf and DCG executed Equipment Schedule No. 1848 ("the Second Equipment

Schedule") on May 8, 2008. (Pl.'s Ex. 2.) The Second Equipment Schedule provided that DCG

would lease to Atlantic Golf, for 60 months, ten used golf carts for a total payment amount of

$54,480.00. (Pl's Ex. 2, at 2-3.) Defendant signed each Equipment Schedule, in his official

capacity as president, on behalf of Atlantic Golf, the lessee. (Pl.'s Ex. 2, at 1; Pl.'s Ex. 3, at 1.)

Both the First and Second Equipment Schedules "incorporate[d] the terms and conditions of the

referenced Master Lease [Agreement]." (Pl.'s Ex. 2, at 1; Pl.'s Ex. 3, at 1.) Each was

guaranteed by Defendant.

Among its provisions, the Master Lease Agreement granted DCG a "first priority security

interest in the Equipment and authorize[d] [DCG] to file UCC financing statements or similar

instruments recording such security interest." (Pl.'s Ex. 1, at 2, § 14.) The Master Lease

Agreement included a forum selection clause and choice of law clause by which the laws of the

state of New Hampshire controlled. (Pl.'s Ex. 1, at 2, § 15.) Section 20 of the Master Lease

5

Agreement is a merger clause that integrates the Master Lease Agreement. (Pl.'s Ex. 1, at 3, §

20.) The Master Lease Agreement stated terms of default. (Pl.'s Ex. 1, at 2, § 16.) The Master

Lease Agreement deems a condition of default to have occurred if:

> (a) [Atlantic Golf] fail[s] to make any payment required pursuant to this lease when due, (b) [Atlantic Golf] fail[s] to perform any obligation in this Lease or any other agreement with [DCG], (c) any representation or warranty made by [Atlantic Golf] is false, (d) a material adverse change (as determined by [DCG]) occurs in [Atlantic Golf's] financial condition or [DCG] believe[s] the prospect of payment or performance is impaired, (e) any insolvency, bankruptcy or other similar proceedings, (f) equipment condition or operation, delivery, defect in title, or seizure of the equipment, (g) death of a personal guarantor or (h) [Atlantic Golf] attempt[s] or actually repudiate[s] or revoke[s] any agreement with [DCG].

(Pl.'s Ex. 1 at 2.)

**2. Atlantic Golf's Default**

The Court finds as a finding of fact that Atlantic Golf and DCG operated pursuant to the

terms of the Master Lease Agreement and each Equipment Schedules until August of 2009.  On

July 6, 2009, DCG sent two letters to Atlantic Golf, one letter for each Equipment Schedule.

(Pl.'s Ex.'s 4, 5.)  Pursuant to the First Equipment Schedule, DCG deemed Atlantic Golf to be in

default for failure to remit timely payments on the leased golf carts.  DCG exercised its right to

accelerate the payment obligation due immediately from Atlantic Golf in the amount of

$35,596.02. (Pl.'s Ex. 4.)  Pursuant to the Second Equipment Schedule, DCG deemed Atlantic

Golf to be in default for failure to remit timely payments on the leased golf carts.  DCG

exercised its right to accelerate the payment obligation due immediately from Atlantic Golf in

the amount of $19,347.09.  (Pl.'s Ex. 5.)

In August of 2009, Atlantic Golf ceased operating.  (Pl.'s Ex. 11; June 7, 2010 Dep. Tr.

of Def. at 26:18-24.)  Defendant testified that, after Atlantic Golf ceased operations, DCG

repossessed certain of the golf carts that DCG had leased to Atlantic Golf.  (Pl.'s Ex. 11; June 7,

6

2010 Dep. Tr. of Def., at 28:2-7.) Defendant, however, testified that he was not present when

employees on behalf of DCG repossessed ten red golf carts that DCG had leased to Atlantic

Golf. An employee of Atlantic Golf was present when representatives of DCG repossessed the

ten red golf carts, and that employee phoned Defendant during the repossession. (Pl.'s Ex. 11;

June 7, 2010 Dep. Tr. of Def. at 33:19.) Defendant later testified that six of the golf carts that

DCG leased to Atlantic Golf were sold to an unknown party. Defendant could not produce

documentation—hard copy or electronic—to evidence that purported sale. (Pl.'s Ex. 11; June 7,

2010 Dep. Tr. of Def. at 39:1-24.) Defendant could not provide a date, or even a year, during

which the purported sale occurred. (Pl.'s Ex. 11; June 7, 2010 Dep. Tr. of Def. at 41:16-25.)

Lastly, Defendant testified that no additional golf carts belonging to Plaintiff were located on

Atlantic Golf's premises. (Pl.'s Ex. 11; June 7, 2010 Dep. Tr. of Def. at 44:2-7.)

Pursuant to the parties' stipulation, as of August 2009, Atlantic Golf owed DCG

$54,883.11 per the Master Lease Agreement. (Stip. of Facts ¶ 14, APN Doc. No. 11.)

Atlantic Golf sold without the consent of DCG six golf carts to third parties, and, as to the

remaining golf carts that DCG leased to Atlantic Golf, the "Debtors have no documentation as to

the disposition of or the location of the remaining carts." (Stip. of Facts ¶¶ 16-17; APN Doc. No.

11.)

The Court finds as a finding of fact that, based on the evidence in the record and

Defendant's deposition testimony, the golf carts not repossessed by DCG that were itemized on

the Equipment Schedules pursuant to the Master Lease Agreement were sold to unidentified

third parties, or otherwise lost. DCG "did not authorize Atlantic Golf or the Debtors to sell,

transfer ownership, or dispose of any of the leased golf carts under the [Master] Lease

Agreement." (Stip. of Facts ¶ 18, APN Doc. No. 11.)

## II. PROCEDURAL HISTORY

On December 14, 2009, Plaintiff filed its Complaint against the Debtors seeking a

determination of nondischargeability as to certain debts pursuant to §§ 523(a)(2)(A), 523(a)(4),

and 523(a)(6) of the Code. (APN Doc. No. 1.) By July 14, 2010, the date of trial in the instant

matter, Plaintiff dropped all counts against Janet M. Hadley, dropped the § 523(a)(2)(A) count,

and dropped the § 727 count. (July 14, 2010 Trial Tr. at 3:23-24, 4:5-6.) Therefore, Charles D.

Hadley, III remains as the only Defendant and the only remaining dischargeability counts against

Defendant are the §§ 523(a)(4) and § 523(a)(6) counts.

On March 11, 2010, the Court issued its Pretrial Order. (APN Doc. No. 8.) Pursuant to

the Pretrial Order, the parties completed discovery on June 15, 2010, and the Court held trial on

the instant matter on July 14, 2010. (APN Doc. No. 12.) At trial, the Court admitted Plaintiff's

Exhibits One through Eleven and heard oral argument from the parties' counsel. (July 14, 2010

Trial Tr. at 6:25-7:1.) No witnesses testified. At the conclusion of trial on July 14, 2010, the

Court continued that matter until August 11, 2010 so that the parties could submit post-trial

briefs and present expert witness testimony, if any, on the issue of damages. (July 14, 2010 Trial

Tr. at 33:7-36:13.)

Plaintiff, in its first post-trial brief, argues that the terms of the lease between DCG and

Atlantic Golf evidence the parties' intent to create a fiduciary relationship. (APN Doc. No. 14 at

4.) The lack of magic words such as "trust" or "fiduciary" in the Master Lease Agreement and

the Equipment Schedules, Plaintiff argues, does not negate the intent of the parties to create a

fiduciary relationship. (APN Doc. No. 14, at 5.)

In the alternative, Plaintiff asserts that Atlantic Golf's debt to DCG ought to be deemed

nondischargeable pursuant to § 523(a)(4) because Atlantic Golf is liable for the embezzlement of

8

the proceeds of the unauthorized sales. (APN Doc. No. 14, at 6-8.) Plaintiff argues that a

finding of embezzlement is warranted because Atlantic Golf was entrusted lawfully with the

property of DCG and that Defendant, acting on behalf of Atlantic Golf, fraudulently appropriated

DCG's property. (APN Doc. No. 14, at 6.) Plaintiff argues that the intent to defraud DCG on

the part of Atlantic Golf—attributable to Defendant—may be inferred. (APN Doc. No. 14, at 6.)

As to the § 523(a)(6) count, Plaintiff argues that Atlantic Golf caused injury to DCG, and

the actions that led to that injury, in this case conversion, were willful and malicious. (APN Doc.

No. 14, at 8.) Plaintiff argues that Defendant's failure to supervise the employees of Atlantic

Golf and the subsequent disappearance and disposition of DCG's collateral constitutes a willful

and malicious injury pursuant to § 523(a)(6). (APN Doc. No. 14, at 11.)

On January 19, 2010, Defendant answered Plaintiff's Complaint. (APN Doc. No. 5.)

Defendant responds that he had no fiduciary relationship with Plaintiff and owed Plaintiff no

fiduciary duty. (APN Doc. No. 5, at 3.) Defendant also disavows knowledge of the disposition

of any of Plaintiffs collateral. Defendant denies that he benefitted from the sale or disposition of

any of the collateral, and, "thus, he has no vicarious liability therefore." (APN Doc. No. 5, at 3.)

Defendant filed a post-trial brief on September 20, 2010, in which he argues that the Master

Lease Agreement did not create a trust. (APN Doc. No. 18, at 4.) The crux of Defendant's

argument is that the Master Lease Agreement fails to create a trust or a fiduciary relationship,

and, therefore, Defendant, as president of Atlantic Golf, is not liable to Plaintiff per § 523(a)(4).

## III. ANALYSIS

### A. The § 523(a)(4) Count Is Dismissed

Section 523(a)(4) of the Code holds that "[a] discharge under section . . . 1328(b) of this

title does not discharge an individual debtor from any debt . . . for fraud or defalcation while

9

acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). Thus, §

523(a)(4) concerns three types of debts: (1) debts arising from fraud or defalcation while acting

in a fiduciary capacity; (2) debts arising from embezzlement; and (3) debts arising from larceny.

*Id.* In this case, Plaintiff has only alleged the first two sub-categories of § 523(a)(4), and there

are no factual allegations that support a finding of larceny.[4] The Court will consider each

allegation in turn.

## 1. Burden of Proof

"At the trial on a complaint objecting to a discharge, the plaintiff has the burden of

proving the objection." Fed. R. Bankr. P. 4005. The Advisory Committee Notes to Rule 4005

state that "the rule leaves to the courts the formulation of rules governing the shift of the burden

of going forward with the evidence . . . ." Fed. R. Bankr. P. 4005 advisory committee's note. In

the Eastern District of Virginia, "the plaintiff has the burden of proof to render a debt

nondischargeable. Under § 523(a), the plaintiff must prove nondischargeability by a

preponderance of the evidence." *KMK Factoring, L.L.C. v. McKnew, (In re McKnew)*, 270 B.R.

593, 617 (Bankr. E.D. Va. 2001) (citing *Grogan v. Garner*, 498 U.S. 279, 291 (1991); *Farouki v.

Emirates Bank Int'l, Ltd.*, 14 F.3d 244, 249 (4th Cir. 1994)); *see also OSB Mfg. v. Hathaway (In

re Hathaway)*, 364 B.R. 220, 234 (Bankr. E.D. Va. 2007); *Elrod v. Bowden (In re Bowden)*, 326

B.R. 62, 86 (Bankr. E.D. Va. 2005) (citing *Parker v. Grant (In re Grant)*, 237 B.R. 97, 115

(Bankr. E.D. Va. 1999)).

## 2. Fraud Or Defalcation While Acting In A Fiduciary Capacity

"To prevail under [§ 523(a)(4)] a creditor must ordinarily make a two-part showing: (1)

---

[4] *In re McKnew*, 270 B.R. at 631 (Bankr. E.D. Va. 2001) (finding that larceny requires "that felonious intent exist at
the time of the taking") (citing *Johnson v. Davis (In re Davis)*, 262 B.R. 663, 671 (Bankr. E.D. Va. 2001)).

10

that the debt in issue arose while the debtor was acting in a fiduciary capacity; and (2) that the

debt arose from the debtor's fraud or defalcation." *Kubota Tractor Corp. v. Strack (In re*

*Strack)*, 524 F.3d 493, 497 (4th Cir. 2008) (citing *Pahlavi v. Ansari (In re Ansari)*, 113 F.3d 17,

20 (4th Cir. 1997)). Citing *Airlines Reporting Corp. v. Ellison (In re Ellison)*, 296 F.3d 266 (4th

Cir. 2002), the *Strack* court named four relevant factors:

> (1) the debtors personally guaranteed the indebtedness; (2) the indebtedness arose
> due to defalcation or 'the breach of a fiduciary relationship between the two
> corporations'; (3) the debtors 'were personally responsible for the conduct that
> gave rise' to their corporation's breach or defalcation; and (4) the debtors'
> 'conduct amount[s] to a breach of their fiduciary duty' to their corporation.

*In re Strack*, 524 F.3d at 500 (quoting *In re Ellison*, 296 F.3d at 270-71). More recently, Chief

Judge Tice expounded upon the Fourth Circuit's ruling in *Strack. Halstead v. Bilter (In re*

*Bilter)*, 413 B.R. 290, 304-07 (Bankr. E.D. Va. 2009).

> The court must first determine whether [the debtor] owed a fiduciary duty to
> plaintiff. While federal law determines whether a fiduciary duty exists under §
> 523(a)(4), in making that determination, the bankruptcy court may refer to state
> law . . . [W]e look to the law of . . . where the trust was allegedly created for
> guidance.

*In re Bilter*, 413 B.R. at 304 (citing *In re Strack*, 524 F.3d at 498; *Davis v. Aetna Acceptance*

*Co.*, 293 U.S. 328, 334 (1934)). "The second element of § 523(a)(4) is that the debtor fiduciary

must have committed a defalcation. Defalcation is defined as 'the slightest misconduct, and it

need not be intentional conduct; negligence or ignorance may be defalcation.'" *In re Bilter*, 413

B.R. at 307 (quoting *Bailey v. Sonnier (In re Sonnier)*, 157 B.R. 976, 984 (E.D. La. 1993)

(quoting *Morales v. Codias (In re Codias)*, 78 B.R. 344, 346 (Bankr. S.D. Fla. 1987))).

In the Fourth Circuit, "[a] defalcation' . . . does not have to rise to the level of 'fraud,'

'embezzlement,' or even 'misappropriation.'" *In re Ansari*, 113 F.3d at 20. "A defalcation

under § 523(a)(4) is the 'misappropriation of trust funds or money held in any fiduciary capacity;

11

[or the] failure to properly account for such funds.'" *Id.*

### a. Hadley Guaranteed The Indebtedness Of Atlantic Golf

The first factor that the *Strack* court names is that the "debtor[] personally guaranteed the indebtedness." *In re Strack*, 524 F.3d at 500. In this case, there is no doubt that Defendant personally guaranteed the indebtedness of Atlantic Golf to TFC. The Master Guaranty, to which Defendant signed as guarantor in his personal capacity, incorporates the terms of the Master Lease Agreement. (Pl.'s Ex. 1, at 3.) The Master Guaranty states:

> As additional inducement for Direct Capital (and our assignees, together "We", "Us", or "Lessor") to enter into this Lease, the undersigned ("You"), jointly and severally, unconditionally personally guarantees that the Customer [Atlantic Golf] will make and meet all obligations required under this Lease fully and promptly . . . . If the Customer defaults, You will immediately pay in accordance with the default provision of the Lease all sums due under the terms of the Lease and will perform all obligations of the Lease.

(Pl.'s Ex. 1, at 3.) Defendant signed and dated the Master Guaranty on March 5, 2007. (Pl.'s Ex. 1, at 3.)

### b. A Fiduciary Relationship Did Not Exist Between Atlantic Golf And DCG

The Court finds that, pursuant to the laws of the State of New Hampshire, an express or technical trust did not exist between Atlantic Golf and DCG. Thus, it necessarily follows that Atlantic Golf did not enter into a fiduciary relationship with DCG. In spite of Defendant's personal guaranty of Atlantic Golf's debts owed to DCG, Plaintiff cannot establish a cognizable claim under § 523(a)(4) against Defendant absent a fiduciary relationship between Atlantic Golf and DCG. Therefore, Plaintiff's § 523(a)(4) count fails without an "indebtedness [that] arose due to defalcation or 'the breach of a fiduciary relationship between the two corporations.'" *In re Strack*, 524 F.3d at 500 (quoting *In re Ellison*, 296 F.3d at 270-71).

### i. The Laws Of The State Of New Hampshire Control

"Property interests are created and defined by state law." *Butner v. United States*, 440

U.S. 48, 55 (1979) (holding that bankruptcy courts should take necessary steps to ensure that

mortgagee is afforded in federal court same protection mortgagee would receive under state law).

In the context of § 541(d), the Fourth Circuit has applied the holding of *Butner. Old Republic*

*Nat'l Title Ins. Co. v. Tyler* (*In re Dameron*), 155 F.3d 718, 722 (4th Cir. 1998) (citing *Butner*,

440 U.S. at 55) (quoting *Barnhill v. Johnson*, 503 U.S. 393, 398 (1992) ("In the absence of any

controlling federal law, 'property' and 'interests in property' are creatures of state law.")). In

this matter, there is no controlling federal interest that would preclude the Court from applying

state law to determine the extent, if any, of Plaintiff's property interest in the chattel leased to

Defendant.

When parties enter into an agreement—absent signs of duress or adhesion—and the

parties' agreement includes a choice of law provision, the laws of the jurisdiction named in that

choice of law provision control. *See, e.g., Nutter v. New Rents, Inc.*, 945 F.2d 398, 1991 WL

193490, at *5-6 (4th Cir. Oct. 1, 1991) (applying Louisiana law due to provision that stated

"[t]his agreement shall be governed by and construed in accordance with the laws of the State of

Louisiana" (internal quotation marks omitted)); *Venners v. Kimball Int'l, Inc.*, 749 F. Supp. 714,

715 (E.D. Va. 1990) (applying Indiana law where "[t]he contract at issue includes . . . an Indiana

choice of law provision"); *Allen v. Lloyd's of London*, 94 F.3d 923, 928 (4th Cir. 1996) (stating

four exclusive factors that would deem a choice of law provision unreasonable—fraud,

inconvenience, deprivation of a remedy, or contravention of public policy of the forum state)

(citing *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 595 (1991), *Bremen v. Zapata Off-*

*Shore Co.*, 407 U.S. 1, 12-13, 15 (1972)); *see also Millard Refrigerated Servs., Inc. v.*

*Landamerica 1031 Exch. Servs., Inc.* (*In re Landamerica Fin. Group, Inc.*), 412 B.R. 800, 811

(Bankr. E.D. Va. 2009) (citations omitted).

Section 15 of the Master Lease Agreement executed between Hadley and DCG selects

New Hampshire as its forum and chooses New Hampshire law. The Master Lease Agreement

states:

> **Choice of Law; Consent to Jurisdiction; Venue**. This Lease is governed
> exclusively by the laws of New Hampshire. You agree to consent to the exclusive
> jurisdiction and venue of any State or Federal Court in Rockingham County, New
> Hampshire. You consent to personal jurisdiction in such court. You waive any
> right to challenge the jurisdiction or venue for any reason. However, We may, in
> our sole discretion, elect to waive the venue requirements and sue in Your home
> state without waiving any other rights. **YOU AGREE TO WAIVE ALL
> RIGHTS TO A JURY TRIAL.**

(Pl.'s Ex. 1, at 2 (emphasis in original).) The record is devoid of any allegations that would even

suggest that Hadley was coerced or otherwise entered into this agreement on unfair terms.

Second, Plaintiff's decision to file this adversary proceeding in the United States Bankruptcy

Court for the Eastern District of Virginia does not render the choice of law provision void. The

provision states clearly that Plaintiff "may, in [its] sole discretion, elect to waive the venue

requirements and sue in [Defendant's] home state without waiving any other rights." (Pl.'s Ex. 1,

at 2.) Thus, Plaintiff's choice to sue in federal court in Virginia—Defendant's home state—

leaves in effect the New Hampshire choice of law provision. Therefore, the Court will apply the

laws of the state of New Hampshire to determine whether a trust was created between Plaintiff

and Atlantic Golf as a result of the Master Lease Agreement.[5]

### ii. An Express Trust Or Technical Trust Must Have Existed

While state law decides whether or not a trust exists, under federal law, § 523(a)(4)

---

[5] The Court reached the same conclusion at trial, and counsel for Plaintiff agreed that the Master Lease Agreement is governed by New Hampshire law. (July 14, 2010 Trial Tr. at 8:22-9:21.)

"applies only to technical or express trusts; it does not generally apply to fiduciary duties implied

by law from the contract." *Ostrum v. Porter (In re Porter)*, APN 03-118, 2008 WL 114914, at

*3-4 (Bankr. N.D. W. Va. Jan. 10, 2008) (citing *In re Bennett*, 989 F.2d 779, 784 (5th Cir.

1983)); *see also Harrell v. Merchant's Express Money Order Co. (In re Harrell)*, 173 F.3d 850,

1999 WL 150278, at *3 (4th Cir. 1999) (unpublished table decision) (citing *Tran v. Tex. Lottery

Comm'n (In re Tran)*, 151 F.3d 339, 342 (5th Cir. 1998)).  A resulting trust and a constructive

trust are trusts that are "implied by law" and "generally serve as a remedy for some dereliction of

duty in a confidential relationship, [and] do not fall within the § 523(a)(4) exception because the

act which created the debt simultaneously created the trust relationship." *In re Porter*, 2008 WL

114914, at *3-4 (quoting *Guerra v. Fernandez-Rocha (In re Fernandez-Rocha)*, 451 F.3d 813,

816 (11th Cir. 2006) (internal quotation marks and citations omitted)).  Therefore, the Court's

review of New Hampshire law will be limited only to express and technical trusts. *See Lassonde

v. Stanton (In re Stanton)*, APN 08-1162-JMD, 2010 WL 757804, at *6 (Bankr. D. N.H. Feb. 8,

2010) ("The fiduciary capacity required under § 523(a)(4) requires an express or technical trust,

not an equitable or implied trust arising under applicable nonbankruptcy law due to the debtor's

conduct.") (citing *Aetna Acceptance Co.*, 293 U.S. at 333; *BAMCO 18 v. Reeves (In re Reeves)*,

124 B.R. 5 (Bankr. D.N.H. 1990)); *see also Puzzo v. Martin (In re Martin)*, 419 B.R. 524, 530

(Bankr. D.N.H. 2009) (internal citations omitted).

 "A trust is a fiduciary relationship in which one person, the trustee, holds the legal title to

property subject to a fiduciary duty to deal with or use the property for the benefit of another, the

beneficiary." *Hanley v. Nottinger (In re Charlie's Quality Carpentry, LLC)*, No. 02-11983-JMD,

2003 WL 22056647, at *4 (Bankr. D.N.H. Aug. 25, 2003) (citing Restatement (Third) of Trusts

§ 2 (2003)).  "Technical language or formalities are not necessary in order to create an express

15

trust in New Hampshire." *In re Charlie's Quality Carpentry, LLC*, 2003 WL 22056647, at *4

(citing *Trustees of Pembroke Acad. v. Epsom Sch. Dis.*, 75 N.H. 408 (1910)); *see also Askenaizer

v. Seacoast Redimix Concrete, LLC (In re Charwill Const., Inc.)*, 391 B.R. 7, 13 (Bankr. D. N.H.

2007) (citing *Trustees of Pembroke Acad.* 75 N.H. 408); *see also In re Stanton*, 2010 WL

757804, at *6. The intent of the parties is crucial, and the parties' agreement may be manifested

in writing, orally, or by conduct. *In re Charlie's Quality Carpentry, LLC*, 2003 WL 22056647,

at *4 (citing *Woburn Nat'l Bank v. Woods*, 77 N.H. 172, 174 (1914)).

    In *Charlie's Quality Carpentry*, the court stated "that in order to create an express trust in

New Hampshire there must be a proper manifestation of the intent to do so, either by the settlor

or in communications between the settlor and the intended trustee." *In re Charlie's Quality

Carpentry, LLC*, 2003 WL 22056647, at *4. These communications between settlor and trustee

need not be in writing. "[E]xpress trusts may include oral trusts. However, the intent of the

declarant and the terms of an oral trust may be established only by clear and convincing

evidence." *In re Stanton*, 2010 WL 757804, at *7 (citing N.H. Rev. Stat. Ann. § 564-B:4-407

(2011)).[6]

    "A technical trust 'is a trust that is imposed by law and may arise either by statute or

common law . . . . Courts have consistently considered state law relevant in determining whether

a technical trust relationship exists for purposes of the Bankruptcy Code.'" *Colledge v. Runge

(In re Runge)*, 226 B.R. 298, 305 (Bankr. D.N.H. 1998) (quoting *M-R Sullivan Mfg. Co., Inc. v.

Sullivan (In re Sullivan)*, 217 B.R. 670, 674 (Bankr. D. Mass. 1998)). The Code of New

Hampshire defines a "fiduciary" as "an agent, trustee, partner, corporate officer or director, or

---

[6] The Court recognizes that N.H. Rev. Stat. Ann. § 564-b:4-407 is part of Title LVI of the New Hampshire Code that
deals expressly with Probate Courts and Decedents' Estates. In *Stanton*, the Bankruptcy Court for the District of

other representative owing a fiduciary duty with respect to an instrument." N.H. Rev. Stat. §

382-A:3-307 (2011).

> The term "fiduciary" in § 523(a)(4) "is limited to the class of fiduciaries including
> trustees of specific written declarations of trusts, guardians, administrators,
> executors, or public officers." And the term only applies to express trusts in
> which "the debtor either expressly signified his intention at the outset of the
> transaction, or was clearly put on notice by some document in existence at the
> outset" explaining that he was undertaking the special responsibilities of a trustee.

*In re Stanton*, 2010 WL 757804, at *6 (citing *BAMCO 18 v. Reeves (In re Reeves)*, 124 B.R. 5,

9-10 (Bankr. D.N.H. 1990); *Reilly v. Beeman (In re Beeman)*, 225 B.R. 522, 525 (Bankr. D.N.H.

1998); *Office of Public Guardian v. Messineo (In re Messineo)*, 192 B.R. 597, 601 (Bankr.

D.N.H. 1996)). The Court finds that—against this backdrop—Atlantic Golf was not a trustee

serving for the benefit of DCG and that Atlantic Golf did not owe a fiduciary duty to DCG.

### iii. The Master Lease Agreement Does Not Create A Trust

The Master Lease Agreement is replete with references to Atlantic Golf as the

"Customer" or "Lessee" and references to DCG as the "Lessor." There is no mention

whatsoever of a fiduciary or trustee-beneficiary relationship in the plain language of the Master

Lease Agreement. Nonetheless, the absence of such magic words alone does not defeat the

existence of a trust in New Hampshire. *See In re Charlie's Quality Carpentry, LLC*, 2003 WL

22056647, at *4 (citing *Trustees of Pembroke Acad.*, 75 N.H. 408).

The Court, however, must examine the intent of the parties to the agreement, which can

be evidenced in writing, orally, or by conduct. *Id.* (citing *Woburn*, 75 N.H. at 174). The only

inference that can be drawn from the Master Lease Agreement and the Subsequent Equipment

Schedules is that the parties—sophisticated commercial entities—intended that the Master Lease

New Hampshire, however, relied on that statute in the context of § 523(a)(4). The Court will also apply the statute
in that same context here.

Agreement be a mere lease agreement, not a trust agreement.

Section 1 of the Master Lease Agreement is titled "Lease and Schedules," and that

section provides that DCG "agree[s] to *lease* to You and You agree to lease from [DCG], the

personal property described in each Equipment Schedule." (Pl.'s Ex. 1, at 1, § 1 (emphasis

added).) Section 3 of the Master Lease Agreement is titled "Equipment," and that section

provides that Atlantic Golf "acknowledge[s] that (a) the Equipment is *leased* to you solely for

commercial or business purposes . . ." (Pl.'s Ex. 1, at 1, § 3 (emphasis added).) Section 8 of the

Master Lease Agreement requires that "[a]s security for the full and prompt payment of the

amounts due under this *Lease*, You will pay us a security deposit in the amount shown on each

Schedule." (Pl.'s Ex. 1, at 1, § 8 (emphasis added).) Further, numerous provisions within the

Master Lease Agreements refer to the monthly payments due from Atlantic Golf as "rent." (Pl.'s

Ex. 1, at 1-2, §§ 2, 9, & 10.) The only reasonable conclusion that the Court can reach is that

DCG and Atlantic Golf intended to enter into a standard equipment lease agreement. Atlantic

Golf was required to tender a deposit securing payment of monthly rent, tender payment on a

monthly basis for a specified period of time, and in the event of non-payment, Atlantic Golf

would be deemed to have defaulted, in which case DCG could retain the security deposit,

accelerate the lease, and repossess the equipment. To find that such an agreement is that of a

fiduciary or trustee-beneficiary relationship would be beyond the intent of the parties and

contravene the law.

The Master Lease Agreement is unambiguous and is fully integrated. Section 20 of the

Master Lease Agreement is a standard merger clause that the Master Lease Agreement

"constitutes the entire agreement between the parties." (Pl.'s Ex. 1, at 3, § 20.) Therefore, the

Court need not look beyond the four corners of the Master Lease Agreement in reaching its

18

decision that no fiduciary relationship exists. Judge Huennekens, interpreting Virginia law, wrote that a plaintiff seeking to establish a trust relationship in light of fully integrated contracts "cannot utilize extrinsic evidence to modify or alter the contracts' plain statements" to conclude that the contracts at issue created a fiduciary relationship. *In re Landamerica Fin. Group, Inc.*, 412 B.R. at 813 (citing *Lisk v. Criswell*, (*In re Criswell*), 52 B.R. 184, 197 (Bankr. E.D. Va. 1985)). "The objective language of the [] Agreements precludes consideration of any subjective belief that the parties may have had regarding the relationship between them." *Id.* (citing *Boone v. United States Attorney*, Case No. 07:06VA00006, 2006 WL 1075010, at *3 (W.D. Va. Apr. 21, 2006)).

New Hampshire law comports with Judge Huennekens's recitation of Virginia law when interpreting a merger clause. *See, e.g., Logic Assocs., Inc. v. Time Share Corp.*, 124 N.H. 565, 572 (N.H. 1984) ("[W]hen two parties have entered into an agreement and have expressed the agreement in a written contract to which both parties have assented as the complete and accurate integration of the contract, evidence offered . . . of previous understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing.") (citing *MacLeod v. Chalet Susse Int'l, Inc.*, 119 N.H. 238, 242 (N.H. 1979)); *cf. Israel College-Educ. Horizons, Ltd. v. S. N.H. Univ.*, No. 05-CV-392-JD, 2008 WL 187606, at *9 (D.N.H. Jan. 17, 2008) (discussing exceptions to general rule that integrated contract bars reliance on parol evidence).

Relying on the Restatement of Trusts, the Third Circuit stated that "the classic definition of a trust [is that] the beneficiary has an equitable interest in the trust property while legal title is vested in the trustee." *The Official Comm. of Unsecured Creditors v. Columbia Gas Sys. Inc. (In re Columbia Gas Sys. Inc.)*, 997 F.2d 1039, 1059 (3d Cir. 1993) (citing Restatement (Second) of Trusts § 2 cmt. F (1959)). Section 5 of the Master Lease Agreement states that title never vested

19

in Atlantic Golf:

> **Title and Location of Equipment**. The Equipment is and shall remain Our personal property and shall not be moved from the location identified in this Lease without Our permission. *You have no right, title or interest in the Equipment except as expressly provided in this Lease.*

(Pl.'s Ex. 1, at 1 (emphasis added).)  Plaintiff's allegation that Atlantic Golf held the golf carts in trust for the benefit of Plaintiff is defeated by the plain language of the fully integrated Master Lease Agreement.  Section 5 makes clear that title *never* vested in Atlantic Golf.  At all times, title to the golf carts remained with Plaintiff.

The Court concludes that a fiduciary relationship did not exist between Plaintiff and Atlantic Golf, such that Atlantic Golf would be deemed to have held in trust—for the benefit of Plaintiff—the proceeds from authorized sales.  In every respect, the Master Lease Agreement is a lease agreement and does not create a trust.  Nowhere in the Master Lease Agreement does the word "trust" appear or does the language give rise to even the most remote of possibilities that Atlantic Golf held the golf carts in trust for the benefit of Plaintiff.  Rather, the Master Lease Agreement and the subsequent Equipment Schedules evidence a lessor-lessee relationship between two sophisticated commercial parties.  Therefore, absent a fiduciary relationship, Plaintiff's § 523(a)(4) count for fraud or defalcation when acting in a fiduciary capacity fails.

### 3. Embezzlement

"This Court has defined 'embezzlement' as 'the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come.'" *KMK Factoring, L.L.C., et al. v. McKnew (In re McKnew)*, 270 B.R. 593, 631 (Bankr. E.D. Va. 2001) (quoting *Johnson v. Davis (In re Davis)*, 262 B.R. 663, 671 (Bankr. E.D. Va. 2001) (internal citations omitted); *see also Crockett v. Ferris (In re Ferris)*, 447 B.R. 516, 524 (Bankr. E.D. Va. 2011) (citing 4 Collier on Bankruptcy ¶ 523.10 (Alan N. Resnick & Henry J. Sommer

20

eds. 16th ed. 2010)); *see also Caviness v. Lane (In re Lane)*, 445 B.R. 555, 565 (Bankr. E.D. Va.
2011). Pursuant to § 523(a)(4), for an act of embezzlement to be deemed a nondischargeable
debt, the debtor and creditor need *not* to have been in a fiduciary relationship. *In re McKnew*,
270 B.R. at 631 (internal citations omitted).

Two recent decisions from Chief Judge Tice highlight what does and what does not
qualify as embezzlement per § 523(a)(4). *Compare In re Lane*, 445 B.R. at 565-66 (finding
nondischargeability for embezzlement where debtor repeatedly misrepresented his corporate
position with banks in order to open bank accounts from which debtor misappropriated and
withdrew corporate funds for personal use), *with In re Ferris*, 447 B.R. at 519-20, 524 (finding
evidence insufficient to establish embezzlement where debtor sold vehicles in which financer
held title to vehicles pursuant to floor plan arrangement). The dichotomy of the factual situations
in which Chief Judge Tice did and did not find embezzlement is notable because the situation in
which the debt was deemed dischargeable resembles closely the facts of the instant matter.

In *Lane*, the debtor was a one-third shareholder as well as a director and the corporate
secretary of a closely held corporation. *In re Lane*, 445 B.R. at 559. The debtor retained sole
control of the corporation's books and records during the relevant period. *Id.* The debtor
withdrew over $95,000.00 from the corporation's bank account at Wachovia. Upon the closing
of the Wachovia account by another director, the debtor subsequently opened a new corporate
account—without authorization and deposited corporate funds—at BB&T, by misrepresenting
himself as the president and CEO of the corporation. *Id.* at 560. The debtor directed BB&T to
send all correspondence to his personal address. The debtor withdrew nearly $5,000.00 in
corporate funds for personal use. Again, another director learned of this action and had closed
the BB&T account. *Id.* at 561. The day after the BB&T account was closed, the debtor opened

21

corporate account—without authorization— at Bank of America, which was closed by another

director. *Id.* Chief Judge Tice wrote that "embezzlement requires a showing that '(1) the person

was lawfully entrusted with property or property lawfully came into the hands of that person, and

(2) the property was fraudulently appropriated.'" *Id.* at 565 (citing *Davis*, 262 B.R. at 671).

That the debtor—without authorization—withdrew tens of thousands of dollars of corporate

funds for his personal use and later admitted his betrayal of trust was sufficient evidence for a

finding of embezzlement. *Id.*

Contrast *Lane* with Chief Judge Tice's opinion in *Ferris*. In *Ferris*, the debtor operated a

used car dealership. The plaintiff in that case financed the debtor's acquisition of used cars, and

the plaintiff retained the paper certificate of title for the particular car after writing a check to the

debtor to cover the purchase price of the vehicle. *In re Ferris*, 447 B.R. at 518. Upon the sale of

a car, the debtor's corporate entity would reimburse the plaintiff the purchase price of the car,

and interest was contemplated by the arrangement. *Id.* The debtor was not able to pay the

plaintiff the necessary reimbursements and was "out of trust on several vehicles." *Id.* at 519.

Upon inspection, the plaintiff, however, discovered that of 80 vehicles to which he held title,

only 4 remained on the debtor's lot. As of the petition date, the debtor sold 73 cars "for which

no repayment was made to [the plaintiff] and for which [the plaintiff] held the original

certificates of title. *Id.* After consider the elements necessary for a § 523(a)(4) finding of

embezzlement, as recited by Collier's,[7] Chief Judge Tice dismissed plaintiff's embezzlement

claim in short order. *Id.* at 524. Such is the case in the instant matter.

---

[7] Citing Colliers, Chief Judge Tice stated the elements necessary for a finding of embezzlement are: "(1)
appropriation of funds for the debtor's own benefit by fraudulent intent or deceit; (2) the deposit of the resulting
funds in an account accessible only to the debtor; and (3) the disbursal or use of those sums without explanation of
reason or purpose." *In re Ferris*, 447 B.R. at 524 (Bankr. E.D. Va. 2011) (citing 4 Collier on Bankruptcy ¶ 523.10
(Alan N. Resnick & Henry J. Sommer eds. 16th ed. 2010)).

**a. Discussion**

"[P]laintiffs must prove (1) the debtor's appropriation of property was for the debtor's benefit and (2) the appropriation occurred with fraudulent intent or by deceit." *In re McKnew*, at 631. The fraudulent intent on the part of the wrongdoer may be inferred from the facts and circumstances of the case. *In re Lane*, 445 B.R. at 565 (quoting *In re Davis*, 262 B.R at 671). In this case, Plaintiff has failed to prove by a preponderance of the evidence that the Debtor acted with the requisite fraudulent intent necessary to meet the standard for embezzlement under § 523(a)(4). Plaintiff's allegations in support of a finding of embezzlement are too attenuated to support a finding of nondischargeability.

The first element of embezzlement requires that the debtor appropriate the property in question for his benefit. There is no evidence on the record that Defendant benefitted from the sale or disposition of the golf carts. The second element of embezzlement requires that the debtor's act of appropriation be motivated by fraudulent intent or deceit. Plaintiff alleges that liability, namely fraudulent intent, should be imputed to Defendant, as the president and majority owner of Atlantic Golf, for the alleged acts of his employees that caused the golf carts to be sold and lost. (APN Doc. No. 14, at 7-8.)

There is no evidence that Defendant directed that the golf carts be sold or disposed of. There is no evidence that even Defendant's employees sold or disposed of the golf carts. Furthermore, there is no evidence, to the extent any exists, that the proceeds from the purported sales of the golf carts were deposited into the accounts of either Atlantic Golf or Defendant, in his individual capacity. There is no evidence that Defendant acted with fraudulent intent or attempted to deceive Plaintiff. Defendant, rather, was merely an absentee manager that

23

delegated responsibility to his employees, and, as a result of that delegation, Plaintiff's collateral

was sold and disposed of without remittance to Plaintiff. There is no doubt that Atlantic Golf, its

employees, and its managers practiced poor record-keeping habits. That is the only finding of

fact that the Court makes with certainty regarding the allegations surrounding Plaintiff's

embezzlement claim. That alone, however, is not sufficient to impute liability and fraudulent

intent on Defendant to merit a finding of nondischargeability.

The situation in *Ferris*—which fell short of embezzlement—resembles the manner in

which Defendant was to remit proceeds of leases and sales of golf carts to Plaintiff. In each case,

the defendant-debtor was, by contract, required to remit proceeds from sales of collateral to a

secured party. In each case, the defendant-debtor ultimately failed to remit the proceeds and the

plaintiff-creditor discovered that collateral was missing from the defendant-debtor's physical

sales location. In each case, there is no evidence that, after acquiring lawfully the collateral, the

defendant-debtor appropriated the collateral with fraudulent intent and disposed of the collateral

for his own benefit. In this case, there is no evidence that Defendant acted with fraudulent intent

to acquire the golf carts for himself after entering into the Master Lease Agreement, on behalf of

Atlantic Golf, with Plaintiff. There is no evidence that Plaintiff benefited from those speculative

and unsubstantiated acquisitions. The facts of this matter, as in *Ferris*, are at odds with the

actions of the debtor in *Lane*.

In *Lane,* the debtor's actions fit squarely into the requisite elements. The debtor acquired

lawfully corporate funds via his position with the corporation and deposited those funds into

corporate accounts while simultaneously misrepresenting himself as president and CEO in order

to withdraw those funds for personal use. In this case, there is no evidence of fraudulent intent

necessary to establish a claim for embezzlement. That the golf carts disappeared without

24

payment, alone, is insufficient. Plaintiff's § 523(a)(4) count that relies on embezzlement fails.

### B. The § 523(a)(6) Count Is Dismissed Without Prejudice

Plaintiff's § 523(a)(6) count fails to state a claim upon which relief can be granted.

Section 523(a)(6) cannot afford relief to Plaintiff because the statute is inapplicable at this stage

the Debtors' Chapter 13 Bankruptcy Case. A debt arising from willful and malicious injury to

property, while nondischargeable in a Chapter 7 case per § 523(a)(6), *is* dischargeable in an

open, pending Chapter 13 case. The plain language of § 1328, when compared to § 523, makes

that clear, as does the case law interpreting the statute.

### 1. Discharge Pursuant To § 1328

Section 1328 governs a debtor's discharge in a Chapter 13 case. 11 U.S.C. § 1328

(2006). A Chapter 13 debtor may receive a discharge of his allowed debts under two alternate

scenarios. First, a debtor may receive a discharge of allowed debts if the debtor completes all of

the plan payments contemplated by his plan. 11 U.S.C. § 1328(a). Second, a debtor may receive

a discharge of allowed debts if, after confirmation of the plan but before completion of all

payments, the debtor fails to complete the plan payments but that failure is

> (1) due to circumstances for which the debtor should not justly be held
> accountable; (2) the value, as of the effective date of the plan, of property actually
> distributed under the plan on account of each allowed unsecured claim is not less
> than the amount that would have been paid on such claim if the estate of the
> debtor had been liquidated under chapter 7 of this title on such date; and (3)
> modification of the plan under section 1329 of this title is not practicable.

11 U.S.C. § 1328(b). The first alternative, under § 1328(a), is referred to as a "completion of

plan" discharge. The second alternative, under § 1328(b), is commonly referred to as a

"hardship discharge." *See, e.g., In re Minahan*, 394 B.R. 116, 132 (Bankr. W.D. Va. 2008); *In re

Awua*, Case No. 96-10613-SSM, 1997 WL 1524900, at *1 (Bankr. E.D. Va. Feb. 24, 1997).

### a. Section 1328(a) Does Not Except From Discharge § 523(a)(6) Debts

25

Section 1328(a) of the Code states:

> [A]s soon as practicable after completion by the debtor of all payments under the plan . . . unless the court approves a written waiver of discharge executed by the debtor after the order for relief under this chapter, the court shall grant the debtor a discharge of all debts provided for by the plan or disallowed under section 502 of this title . . . .

11 U.S.C. § 1328(a). Subsection 1328(a)(2) excepts from a completion of plan discharge debts of the kind specified in § 507(a)(8)(C) or in §§ 523(a)(1)(B)-(C), 523(a)(2), 523(a)(3), 523(a)(4), 523(a)(5), 523(a)(8), or 523(a)(9.). Notably, § 523(a)(6) is omitted amidst the other specified subsections of § 523(a) spelled out in § 1328(a)(2). 11 U.S.C. § 1328(a)(2). Section 1328(a)(4) excepts from a completion of plan discharge debts "for restitution, or damages, awarded in a civil action against the debtor as a result of willful or malicious injury by the debtor that caused *personal injury to an individual or the death of an individual*." 11 U.S.C. § 1328(a)(4) (emphasis added).

Section 1328(a) makes clear that a debtor who completes his plan payments may not discharge a debt that stems from a civil judgment where damages were assessed against the defendant-debtor for his willful or malicious actions that caused personal injury to an individual or death to an individual. Section 1328(a) only allows for a determination of nondischargeability when the debt arises out of a debtor's willful or malicious act that causes injury or death to another individual, *not* injury to property, as is the case in the instant matter before the Court.

Paragraph (a) of § 523 states that "[a] discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt . . ." and then enumerates the various categories of debts. 11 U.S.C. § 523(a). Section 523(a)(6) excepts from discharge debts "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). Section 1328(a)—the completion of plan

26

discharge—is omitted from the language of § 523(a). *Cf. In re Hardenberg*, 42 F.3d 986, 992

(6th Cir. 1994) (holding that state criminal fines are nondischargeable debts in a Chapter 7 case

per § 523(a)(7) but state criminal fines are dischargeable in a Chapter 13 case where debtor

completes plan payments and is discharged per § 1328(a)).

"[W]here Congress includes particular language in one section of a statute but omits it in

another provision of the same Act, it is generally presumed that Congress acts intentionally and

purposefully in the disparate inclusion or exclusion." *Soliman v. Gonzales*, 419 F.3d 276, 283

(4th Cir. 2005) (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987)). The Court presumes

that, by excluding § 1328(a) from the enumerated list in § 523(a) of the Code's discharge

provisions across various chapters, Congress did so purposefully. Thus, a debt for willful and

malicious injury by the debtor to the *property* of another entity *is* dischargeable when a Chapter

13 debtor completes the payments contemplated by his Chapter 13 plan. The Court also

presumes that, by limiting § 1328(a)(4)'s application to willful or malicious injuries that caused

personal injury or death to an individual, Congress acted intentionally when it deemed

dischargeable, upon completion of plan payments, debts arising from willful and malicious

injuries to the property of another entity.

In this matter, if and when Defendant completes all his requisite Chapter 13 plan

payments, then the debt Defendant owes to DCG is dischargeable pursuant to § 1328(a).

Defendant is alleged to have caused a willful or malicious injury to DCG's property—its golf

carts and other collateral. There is no allegation that Defendant willfully or maliciously injured

any individual. The scope of § 1328(a)(4)'s exception to a completion of plan discharge is

narrow, and the allegations in this matter fall outside that scope because they concern only injury

to personal property. Therefore, given the exclusion of § 523(a)(6) in § 1328(a)(2) and the

27

narrow construction of § 1328(a)(4), Plaintiff's § 523(a)(6) claim is inapplicable if and when the

Debtors are discharged pursuant to § 1328(a). *See, e.g., Shawnee v. Hodges* (*In re Hodges*), 407

B.R. 415, 418-19 (Bankr. D. Kan. 2009) ("Section 523(a)(6) is not incorporated into §

1328(a)(2); thus [plaintiff] fails to state a claim for relief by citing § 523(a)(6).") (internal

footnotes omitted); *see also Parrish v. Parrish* (*In re Parrish*), APN 08-8014-TJM, 2009 WL

6338568, at *5 (Bankr. D. Neb. Dec. 1, 2009) (stating that "debts of the type covered by §

523(a)(6) are among those discharged if a debtor completes all payments under the plan").

### b. Determination Of Nondischargeability Pursuant To § 1328(b) Is Not Ripe

Section 1328(b) allows a court to grant a Chapter 13 debtor a discharge when the debtor

fails to complete all the payments contemplated in a plan confirmed by the court. The debtor

may receive a discharge if, after confirmation of the plan but before completion of all payments,

the debtor fails to complete the plan payments but that failure is

> (1) due to circumstances for which the debtor should not justly be held
> accountable; (2) the value, as of the effective date of the plan, of property actually
> distributed under the plan on account of each allowed unsecured claim is not less
> than the amount that would have been paid on such claim if the estate of the
> debtor had been liquidated under chapter 7 of this title on such date; and (3)
> modification of the plan under section 1329 of this title is not practicable.

11 U.S.C. § 1328(b). In order for a court to grant a debtor a discharge per § 1328(b), the court

must confirm the debtor's Chapter 13 plan, hold a hearing, and find that each of the three

elements in § 1328(b)'s subsections be present. *Id.* Furthermore, § 1328(c) states that "[a]

discharge granted under subsection (b) of this section discharges the debtor from all unsecured

debts provided for by the plan or disallowed under section 502 of this title, except any debt--(1)

provided for under section 1322(b)(5) of this title; or (2) of a kind specified in section 523(a) of

this title." 11 U.S.C. § 1328(c). Section 1322(b)(5) is not applicable in this case. Section

523(a), however, is applicable in this matter.

28

After a court grants a debtor a discharge per § 1328(b), a party-in-interest may object to the discharge of a debt on the basis of § 523(a) according to the plain language of § 1328(c). Notably, there are no constrictions as to which paragraphs of § 523(a) are applicable to a § 1328(b) discharge, in contrast to the restrictions present in § 1328(a)(2) noted above. In order for § 523(a) to be applicable when a debtor is discharged pursuant to § 1328(b), the statute requires that, obviously, the debtor be granted a hardship discharge per § 1328(b).

In this case, no party, including the Debtors, has moved for a discharge pursuant to § 1328(b), much less the Court having granted the Debtors a discharge per § 1328(b). Therefore, § 1328(c)'s reference to § 523(a) has no applicability at this stage of the Debtors' Chapter 13 case, and thus, Plaintiff cannot rely on § 523(a)(6) as the basis for its complaint seeking nondischargeability of a debt.

Plaintiff's § 523(a)(6) count is not ripe at this time. The Debtors filed their Third Amended Chapter 13 Plan on July 8, 2010 (the "Third Amended Plan"). (Case No. 09-73717-FJS, Doc. No. 81.) The Court has not yet entered an Order of Confirmation on the Third Amended Plan, nor has the Court entered an Order Denying Confirmation of the Third Amended Plan. Thus, absent confirmation of the Third Amended Plan, § 1328(b) is inapplicable at this time. If the Debtors convert their case to a case under Chapter 7 or if the Debtors seek a hardship discharge per § 1328(b), then the Court will reconsider Plaintiff's § 523(a)(6) count at that time and render an appropriate ruling. *See Eric D. Fein, P.C. & Assoc. v. Young (In re Young)*, 425 B.R. 811, 815 (Bankr. E.D. Tex. 2010) ("[T]he plaintiff's § 523(a)(6) claim is not ripe for decision because 'resolution of the issue has no meaningful effect until and unless the debtor moves for hardship discharge, a contingency that occurs only in a small percentage of Chapter 13 cases.'") (quoting *Ambassadors Travel Servs. v. Liescheidt (In re Liescheidt)*, 404

29

B.R. 499, 505 (Bankr. C.D. Ill. 2009)).[8]  Accordingly, the Court dismisses without prejudice Plaintiff's § 523(a)(6) count; only upon the grant of a hardship discharge per § 1328(b) or upon the conversion of Debtors' case to a case under Chapter 7 will the Court revisit Plaintiff's § 523(a)(6) count.

## IV. CONCLUSION

For the reasons stated above, the Court concludes that Plaintiff Direct Capital Group, LLC's Complaint against Defendant Charles D. Hadley seeking a determination of nondischargeability as to certain debts pursuant to 11 U.S.C. § 523(a) is DISMISSED. Plaintiff's § 523(a)(4) Count is DENIED WITH PREJUDICE.  Plaintiff's § 523(a)(6) Count is DENIED WITHOUT PREJUDICE.

Upon entry of this Memorandum Opinion, the Clerk of Court is directed to serve via United States Mail, first class postage prepaid, a copy of this Memorandum Opinion to: Jeffrey L. Marks, Esq., Kaufman & Canoles, Suite 700, 2101 Parks Avenue, Virginia Beach, Virginia, 23451; Leonard D. Levine, Esq., Childress, Flax, Levine, P.C., 533 Newtown Road, Suite 101, Virginia Beach, Virginia, 23462; Charles David Hadley, III, 1006 Broward Way, Chesapeake, Virginia, 23322; Michael P. Cotter, Esq., Chapter 13 Trustee, 870 Greenbrier Circle, Suite 402,

---

[8] Judge Perkins, in *Liescheidt*, explains well the issue before the Court:

> Where a debtor is proceeding toward a full compliance discharge, that would by definition discharge a Section 523(a)(6) debt, there is no reason to litigate the issue of whether the debt is, in fact, one for a willful and malicious injury.  Whether it is or isn't doesn't matter, since it will be discharged either way if the debtor receives a full compliance discharge.  Only if the debtor subsequently moves for a hardship discharge, which would not discharge a debt for a willful and malicious injury, would it matter.  This principle is embodied in Rule 4007(d), which provides that when a debtor files a motion for hardship discharge, the court shall fix a deadline for creditors to file complaints under Section 523(a)(6) and provide notice of the deadline to all creditors.

*Liescheidt*, 404 B.R. at 504 (dismissing without prejudice plaintiff's § 523(a)(6) claim for lack of subject matter jurisdiction).

Chesapeake, Virginia, 23320; Reginald J. Padgett, Esq., 1005 Cronin Court, Chesapeake,

Virginia, 23322; James T. Lang, Esq., Pender & Coward, P.C., 222 Central Park Ave., Virginia

Beach, Virginia, 23462; Daniel F. Blanks, Esq., McGuireWoods LLP, 9000 World Trade Center,

101 W. Main St., Norfolk, Virginia, 23510; Erin Quinn Ashcroft, Esq., McGuire Woods LLP,

101 W. Main Street, 9000 World Trade Center, Norfolk, Virginia, 23510.


A SEPARATE ORDER WILL ISSUE.


DATED:

8-19-2011

FRANK J. SANTORO
United States Bankruptcy Judge


NOTICE OF JUDGMENT OR ORDER
Entered on docket AUG 1 9 2011

31